(No. 78-CC-1439-)

WILLIE ROBINSON, Claimant, *v.* THE STATE OF ILLINOIS, ILLINOIS DEPARTMENT OF TRANSPORTATION, DIVISION OF HIGHWAYS, Respondent.

*Opinion filed December 24, 1981.*

JAMES K. MAREMONT, for Claimant.

TYRONE C. FAHNER, Attorney General (JOHN R. FANONE, Assistant Attorney General, of counsel), for Respondent.

Roe, C. J.

This claim is based on alleged negligence of the State of Illinois, Department of Transportation, in the maintenance of the understructure of a bridge of the Kennedy Expressway overpassing Logan Avenue in Chicago.

Claimant testified that on February 23, 1977, she was operating an automobile going west on Logan Boulevard under the Kennedy Expressway at 20 to 30 miles per hour when suddenly a piece of concrete fell upon the hood of her car. She became very scared and slammed on the brakes, causing her body to be propelled forward and backward. She got out of her car and noticed that a piece of concrete was resting on it, the concrete being an object of about five pounds in weight. She looked up and saw a big hole on the understructure of the Kennedy Expressway. The hole location looked "real clean" like "fresh cement." The hole roughly corresponded to the size of the piece of cement on her hood. She noticed no plywood or any other flooring under the expressway structure.

Gladys Algarian, an eyewitness to the incident, testified in substantial corroboration of Claimant's testimony. She further testified that she did not ever see a sign on Logan Boulevard warning against falling concrete, nor was Logan Boulevard ever blocked off.

The investigating Chicago police officer, Max Steele, testified that when he arrived on the scene he noticed Claimant's car with stones on its top, damage to the hood and a cracked windshield. He noticed no plywood on the underportion of the bridge. The Claimant, at the scene, was standing and walking with no observable injuries.

Robert Thurmaier, a civil engineer employed by the State of Illinois, testified that he worked in the bridge section for the bureau of maintenance which is responsible for maintaining State bridges in Cook County. He testified that as early as 1974 the State became aware that concrete was falling from the superstructure in question and that it was a continuous problem. The Department, in 1974, placed plywood under the longitudinal joints of the bridge (those running parallel with the length of the bridge) in order to protect the public from falling concrete. However, the plywood did not cover the entire bottom of the superstructure inasmuch as the area showing deterioration of concrete tended to be that involving only the longitudinal joints. In 1975 the plywood disappeared and was replaced in 1976. There are no records indicating disappearance of the plywood until February 23, 1977, the date of the accident.

Thurmaier further testified that the placing of the plywood flooring to catch falling concrete was a temporary measure. Long-term repairs to the concrete understructure itself are available but were beyond the economic resources available to the Department.

The Department of Transportation's civil engineer whose duty it was to inspect bridges, Thomas Warnock, testified that in 1975 he noted as to the underside of the bridge,—"Minor breakout on underside of longitudinal joint near Southwest corner—not serious." He did not

then recommend repairs to the concrete itself, feeling that the plywood flooring adequately would protect persons under the bridge. In May 1977 (after the accident in question), he rated cracking on the bridge in question as "in poor condition." He felt that the longitudinal joints should be replaced. He did not, however, note crackage of concrete on the underside of the deck, but only noticed the problem under the longitudinal joints and the handrail parapet.

The optimum repair, according to Warnock, was to repair the concrete at the bottom of the substructure but repairs such as those are subject to the funds available. He further testified that once concrete begins falling, the vibrations of the vehicular traffic above it would contribute to its continuing to fall and unless repairs are made to the concrete itself, the condition will worsen.

On the issue of liability, it is our opinion that Claimant has proved by a preponderance of the evidence that Respondent had reasonable notice of the dangerous condition of the bridge in question and despite that notice negligently failed to repair the problem and that such omission was the proximate cause of Claimant's injury.

Respondent knew approximately three years before the accident that there was concrete falling from the underside of the bridge in question, as evidenced by the testimony of both State engineers. They knew that such a condition inevitably becomes worse.

Respondent argues that, although it knew that parts of the underside of the bridge were defective, that those parts were unrelated to the Claimant's accident and that therefore Respondent did not have knowledge that the

underside of the bridge in other areas was defective and further, that inasmuch as Claimant testified she saw no plywood, it must be assumed that the concrete fell from an area which was not noticeably defective. We do not agree.

Notice of falling concrete from the underside of the bridge is actual notice of a defective underside. Respondent knew that the condition, unrepaired, would worsen. Thus, the notice of a defect of part of a bridge becomes notice of the potential defects of the rest of the bridge.

Furthermore, there is no evidence that the concrete came from the unnoticed portion of the bridge other than Respondent's assumption that it must have because it came from the part unprotected by plywood. The testimony of Claimant and, even more important, the testimony of the investigating police officer was that there was no plywood present, at all, under the bridge. Thus, the concrete in question could have come from any part of the bridge, even from the longitudinal joint area.

Respondent was negligent in its failure to repair the concrete. The plywood "protection" was subject to disappearance and in fact was not in place at the time of Claimant's accident. It was, apparently, only lack of funding that prevented permanent repairs. Furthermore, Respondent never blocked off the street in question nor did Respondent post warning signs. Its failure to repair or otherwise protect the public from falling concrete constitutes substantial evidence of negligence.

On the issue of damages, the extent of Claimant's injuries are somewhat questionable. After the accident she was walking and standing at the scene and had no observable signs of injury. The injury was caused, not by

the impact of the concrete with the car, but by a sudden braking of the car by Claimant travelling at 20 to 30 miles per hour. It is questionable whether braking of a car by the Claimant at that speed can cause any severe injury of the sort here claimed. Claimant did not seek medical attention until five days after the accident when she saw Dr. Ralee Mamme, a chiropractor. She had soft tissue injury only—spasm of the muscles of the neck, shoulder, side and back, and headaches. She was treated by manipulative therapy, physiotherapy, and a cervical collar and rest. She was advised to stay away from her employment as a punch press operator until April 30, 1977, during which time she saw her doctor 10 times. She has no present pain. The doctor bill was $419.00.

In fact, Claimant stayed home from her employment until June 6, 1977, claiming she could not work because of pain in the neck and back. However, she discarded her cervical collar about two months after the accident and she was hospitalized from May 9, 1977, to May 16, 1977, for an unrelated kidney problem. Interestingly, she stayed off work for a total of 17 weeks, the same being the total weeks of sick pay allowed by her employer.

In our opinion, her injury could not have required being off work for more than four weeks. Her weekly salary was $172.40.

In accordance with the decision of this Court in *National Bank of Bloomington v. State of Illinois* (1980), 34 Ill. Ct. Cl. 23, Respondent is entitled to credit as a set-off the sum of $80.00 per week received by Claimant from her employer for sick pay or a total credit for four weeks of $320.00. Thus the net pay loss to Claimant was $369.60 Her other items of special damage are as follows:

| | |
|---|---|
| Doctor bill | $ 419.00 |
| Property damage | 654.65 |

Because of the questionable nature of the evidence pertaining to her injury, we feel that Claimant is entitled to $2,500.00 as full compensation for this claim. So ordered.